**EXHIBIT 1**

Case 2:14-cv-01752-BRO-JC   Document 66-1   Filed 03/23/15   Page 2 of 5   Page ID #:638

Kim vs. BMW                                                    Deposition of Alison E. Parillo, V. 1

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2
                            - - -
 3
    SEUNGTAE KIM, an individual;         :
 4                                       :
         Plaintiff,                      :
 5                                       :
                                         :
 6      vs.                              : Case No.
                                         : CV 14 - 1752 BRO SH
 7                                       :
    BMW FINANCIAL SERVICES, NA,          :
 8  LLC., a business entity;             :
    EQUIFAX INFORMATION SERVICES         : VOLUME 1
 9  LLC, a business entity;              :
    EXPERIAN INFORMATION                 :
10  SOLUTIONS, INC., a                   :
    Corporation; TRANSUNION, LLC.,       :
11  a business entity, and DOES          :
    1-10, Inclusive,                     :
12                                       :
         Defendants.                     :
13                                       :

14                          - - -

15                       DEPOSITION

16    of ALISON E. PARILLO, taken before me, Lauren N. Terrell, a

17  Notary Public in and for the State of Ohio, at the offices

18  of BMW Financial Services, 5550 Britton Parkway, Hilliard,

19  Ohio 43026, on Thursday, February 26th, 2015, at 4:04 p.m.

20                          - - -

21

22

23

24
```

Kim vs. BMW                                                                 Deposition of Alison E. Parillo, V. 2

**Page 138**

Q. Right. So my question was if there was a previous address associated with this file, would you expect that to be indicated in the previous address section?
    MS. CALEY: Don't speculate but answer if you can.
A. I don't -- I don't want to speculate.
BY MS. TATER:
Q. Have you ever seen the previous address section populated on an ACDV before?
A. No.
Q. Was it the policy for your Credit Reporting Specialists to populate as many fields as possible in that response data section?
A. I wouldn't say it was written procedure, no.
Q. But was it discussed?
A. To have as many fields populated? No.
Q. Okay. What is it that your Credit Reporting Specialists were told to do with respect to the response data section on these ACDVs?
A. To verify name, address, social security number, and date of birth.
Q. Okay. And so we see here on this ACDV that -- at the very least -- the first name was different, the middle initial was different, and the addresses were different.

**Page 139**

And the account was accurate as of date reported. That's what you told Experian. Correct?
A. That the account was accurate, yes.
Q. Despite the differences that you can see here on the ACDV, it was still verified?
A. Yes.
Q. Okay. What differences on this ACDV, in your experience, would have triggered a delete response code?
A. Repeat the question.
Q. What information on this ACDV would have triggered a delete code for this type of dispute, this identity theft dispute?
A. None.
Q. Why?
A. Because a delete code means that BMW Financial agrees that this should not be a trade under the customer's name and that information comes from the fraud group.
Q. Okay. So at the time of the first few disputes -- let's start with the September 18th, 2013 response. Let me know when you have that.
A. Okay.
Q. The Fraud Unit hadn't -- did you say Fraud Unit?
A. I mean, unit, department --
Q. Okay.

**Page 140**

A. -- person.
Q. I just wanted to make sure I was on the same page with you. The fraud department had not completed its identity theft investigation. Correct?
A. As of what date?
Q. September 18th, 2013.
A. Correct, they had not completed it.
Q. As of September 23rd, they had not completed their investigation. Correct?
A. Correct.
Q. As of September 24th, they had not completed their investigation. Correct?
A. Correct.
Q. And as of October 23rd, they had not completed their investigation. Correct?
A. Correct.
Q. Was it the policy of BMW at the time these disputes were coming in up until October 23, 2013 to simply verify the ACDVs or the accounts while an investigation into identity theft was going on?
A. What do you mean by verify?
Q. To use the Response Code 1.
A. Correct.
Q. Okay. Was there at any point in time before

**Page 141**

October 23rd between the first dispute on September 18th response -- let's go with the dispute dates. Was there any point in time between September 6th, 2013 and October 13th, 2013 that the Credit Reporting Specialist in your department communicated with the fraud department regarding the claim of identity theft that Mr. Kim had submitted?
A. I don't know.
Q. Is there anything that would tell you whether or not there was any communication?
A. No.
Q. Is there any reason for you to believe that there was communication between your department and the fraud department?
    MS. CALEY: Objection. The same time period?
    MS. TATER: Yes, the same time period.
A. Again, it depended upon the specialist.
BY MS. TATER:
Q. You were the manager of the department. Correct?
A. Uh-huh.
Q. And you understand that you've been identified as the person most knowledgeable regarding the credit disputes and the credit reporting in this case?
A. Correct.

Case 2:14-cv-01752-BRO-JC   Document 66-1   Filed 03/23/15   Page 4 of 5   Page ID #:640

Kim vs. BMW                                                            Deposition of Alison E. Parillo, V. 2

**Page 150**

1  A.   I think they were all —
2  Q.   Do you know what exhibit these were?
3       MS. TATER: I don't think we marked them.
4  Let's mark them. Twenty-one?
5       - - -
6       And, thereupon, Deposition Exhibit No. 21
7  was marked for purposes of identification.
8       - - -
9  BY MS. CALEY:
10 Q.   The Exhibit 21 notes, you indicated that those are
11 reviewed by someone in your department?
12 A.   Correct.
13 Q.   And that you also testified, I think, earlier that
14 the day a report is received electronically is not
15 necessarily the first day it starts to be worked?
16 A.   Correct.
17 Q.   Okay. So what we know from the very first
18 report — according to these Exhibit 21 notes — is the very
19 first report is noted as having been received when?
20 A.   9/6.
21 Q.   And when is that note looked at? And that's a
22 note from 9/18 that's identifying that was the receipt date;
23 is that correct?
24 A.   The response date.

**Page 151**

1  Q.   I'm sorry. The response date is 9/18. Okay.
2  Now, is there anything before 9/18 that indicates that any
3  information has been received from Mr. Kim, any
4  documentation regarding his claim of identity theft?
5  A.   That Mr. Kim sent us anything?
6  Q.   Yes, that BMW received any documents.
7  A.   No.
8  Q.   So on 9/18 there's nothing in the notes reflected
9  any documents from Mr. Kim in support of his fraud or ID
10 theft is available to BMW at that point?
11 A.   Correct.
12 Q.   And in that time of September 2013, was there a
13 means available to a customer to be able to send documents
14 with their EOscar dispute?
15 A.   Yes.
16 Q.   And from the notes, can you tell whether or not
17 any such documents were actually sent with the dispute?
18 A.   Yes.
19 Q.   And what does the note say?
20 A.   No Images.
21 Q.   So the person who is looking at this on 9/18 has
22 no documents in the EOscar dispute to look at?
23 A.   Correct.
24 Q.   Are those hyperlinked to the dispute somehow? I

**Page 152**

1  mean, do you know how they're accessed?
2  A.   Yes.
3  Q.   How are they accessed?
4  A.   There's a link on the dispute.
5  Q.   So they can press it and look and see here's what
6  the customer sent?
7  A.   Yes.
8  Q.   But also on 9/18, there's nothing there to show
9  that any documents had been received in the mail from
10 Mr. Kim?
11 A.   Correct.
12 Q.   So the person who is considering and responding to
13 this request, what information other than the account notes
14 does the credit — I'm sorry. What is the title of the
15 person looking at it?
16 A.   Credit Reporting Specialist.
17 Q.   The Credit Reporting Specialist. Other than BMW's
18 own records and the — is it 103 Code, you said?
19 A.   Uh-huh.
20 Q.   Other than the 103 Code saying identity theft,
21 what do they have at this time on 9/18 to consider other
22 than his word that it's a dispute to support consideration
23 that it's an ID theft?
24 A.   Nothing.

**Page 153**

1  Q.   Okay. Let me ask you to look at all of the
2  disputes received in 2013.
3  A.   Uh-huh.
4  Q.   I'm going to ask you to look at it for yourself
5  and see if each and every one — again, from Exhibit 21 —
6  that was received from every credit reporting agency, if you
7  could tell if there was any affirmative notice one way or
8  the other whether any documents were received in support of
9  each identity theft dispute —
10      MS. TATER: From the EOscar system?
11 BY MS. CALEY:
12 Q.   — from the EOscar system.
13 A.   No images on any of the disputes.
14 Q.   And the one in 2014, were there any documents?
15 A.   No.
16 Q.   Now, the notes do show that on 9/23, certain
17 documents were received from Mr. Kim, I presume, in the
18 mail?
19 A.   Correct.
20 Q.   And so what is your department's procedure when an
21 identity theft report is made and then documents are
22 thereafter sent by the customer for consideration?
23 A.   We continue to respond with a Response Code of 1
24 until we are advised to do otherwise.

| Kim vs. BMW | Deposition of Alison E. Parillo, V. 2 |

**Page 162**

1  Q.    And so you don't know whether it is or it could be
2  affected one way or the other?
3  A.    Correct.
4  Q.    Okay. And this information that's populated down
5  here, this is affirmatively input by BMW Financial Services?
6  Or is it populated some other way?
7  A.    This could be information that was the last
8  information that was provided. So it could be pre-populated
9  by EOscar or it could be information that we put in.
10 Q.    So it could be either?
11 A.    Yes.
12 Q.    So earlier there was questions about -- on the top
13 third -- social security number, date of birth, telephone
14 number. These areas were blank on the right-hand side, do
15 you see that?
16 A.    Uh-huh.
17 Q.    And if I'm understanding your testimony correct --
18 I just want to clarify -- is it your understanding that
19 those don't get populated unless there's a difference from
20 the preexisting record?
21 A.    Correct.
22 Q.    So when you look right above, there's two
23 different addresses. That would be consistent with that
24 practice?

**Page 163**

1  A.    Yes.
2  Q.    And have you ever seen name variances on accounts
3  before where there's no dispute as to the identity theft of
4  a customer?
5  A.    I'm sorry, what was that?
6  Q.    Have you ever seen name variances on an account
7  being forwarded to you where there was no dispute of
8  identity theft?
9  A.    Yes.
10 Q.    Is that uncommon?
11 A.    I would say it is common.
12 Q.    Is it fair to say that the department that is
13 charged with the responsibility of making an identity theft
14 determination is the SAR expert?
15 A.    Yes.
16        MS. CALEY: Okay. I think I'm almost
17 done. I'm doing what you're doing, so if you want
18 to --
19        ...
20        RECROSS-EXAMINATION
21 BY MS. TATER:
22 Q.    The department that you worked in, the Credit
23 Reporting Specialists, they waited for the fraud department
24 to make a determination on identity theft before they would

**Page 164**

1  let the credit reporting agencies know that this was,
2  indeed, an identity theft and instruct them to delete it
3  then?
4  A.    Correct.
5  Q.    So did they do an independent investigation on
6  their own?
7  A.    No.
8  Q.    Okay. The individuals that were responsible for
9  the credit reporting disputes, investigations, were they
10 trained in identity theft?
11 A.    No.
12 Q.    How to spot it?
13 A.    No.
14 Q.    What to look for?
15 A.    No.
16 Q.    I want to take a look at Exhibit 20.
17 A.    Okay.
18 Q.    First of all, just so that I'm clear -- because
19 I'm not sure that I am anymore -- the information that
20 starts with that account status and goes down through the
21 compliance code section, that information actually comes
22 from BMW whether or not it was populated through EOscar.
23 But it's not made up by the credit reporting agencies,
24 right?

**Page 165**

1  A.    Correct.
2  Q.    So at some point, this information came into its
3  existence on this ACDV through BMW's system?
4  A.    Correct.
5  Q.    What is Response Code 1, "account information
6  accurate as of date reported." What does that mean?
7  A.    So we're verifying that the information on the
8  account is accurate as of the report date.
9  Q.    You're verifying it despite the address
10 differences?
11        MS. CALEY: Objection. Argumentative and
12 presumes facts not in evidence or not established.
13 BY MS. TATER:
14 Q.    You can answer it.
15 A.    Yes.
16 Q.    Okay. And the name differences?
17 A.    Correct.
18 Q.    Okay. What's accurate then? What are you saying?
19 What information is accurate as of the date it was reported?
20 A.    As of the date reported, that this is the
21 information that we have on our account.
22 Q.    So you're saying the information in the response
23 data section is accurate or the information in the request
24 data is accurate?