**EXHIBIT 2**

```
 1                UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2
                            - - -
 3
    SEUNGTAE KIM, an individual;          :
 4                                        :
            Plaintiff,                    :
 5                                        :
                                          :
 6       vs.                              : Case No.
                                          : CV 14 - 1752 BRO SH
 7                                        :
    BMW FINANCIAL SERVICES, NA,           :
 8  LLC., a business entity;              :
    EQUIFAX INFORMATION SERVICES          :
 9  LLC, a business entity;               :
    EXPERIAN INFORMATION                  :
10  SOLUTIONS, INC., a                    :
    Corporation; TRANSUNION, LLC.,        :
11  a business entity, and DOES           :
    1-10, Inclusive,                      :
12                                        :
            Defendants.                   :
13                                        :

14                          - - -

15                       DEPOSITION

16   of ANGELA JAROSIK, taken before me, Lauren N. Terrell, a

17  Notary Public in and for the State of Ohio, at the offices

18  of BMW Financial Services, 5550 Britton Parkway, Hilliard,

19  Ohio 43026, on Thursday, February 26th, 2015, at 9:59 a.m.

20                          - - -

21

22

23

24
```

**Page 98**

Q. Okay. How did you get the address for my client in order to send him that initial paperwork?
A. It was provided by David Webster.
Q. So the email, I presume, contained some kind of contact information so that you could send Mr. Kim the identity theft packet?
A. Yes.
Q. Okay. So when did you send the letter to Mr. Kim?
A. On September 10th, 2013.
Q. And that packet contained a cover letter and a blank affidavit. Correct?
A. Correct.
Q. Is there anything else that you remember sending to Mr. Kim on that initial contact?
A. No.
Q. Okay. What happened next? So you sent out the letter and then what?
A. And then I updated my spreadsheet, and at that point nothing further is done.
Q. Okay. And the next time that you had access or that you accessed the account was when you received the fraud paperwork from my client. Correct?
A. Correct.
Q. When was that?

**Page 99**

A. That was on September 23rd, 2013.
Q. Okay. Let me go back for one second.
   MS. CALEY: And I just want to note it is twelve. Do you have an idea -- obviously we're not going to finish with her before lunch. Do you have a time when you want to stop?
   MS. TATER: Let's get through -- can we go, like, 15 more minutes?
   MS. CALEY: Sure.
   MS. TATER: I'm going to ask her just this stuff about the fraud packet and then we can take a break. How long of a lunch did you want?
   MS. CALEY: What we can do is -- what --
   MS. TATER: Let's go off the record for this.
   (Discussion held off the record.)
   MS. TATER: Let's go back on the record.
BY MS. TATER:
Q. I'm going to show you what I will mark as Exhibit No. 3.
   ---
   And, thereupon, Deposition Exhibit No. 3 was marked for purposes of identification.
   ---

**Page 100**

BY MS. TATER:
Q. Do you recognize that document?
A. Yes.
Q. And what is that document?
A. That's the cover page of our identity theft packet.
Q. And that's a letter that was sent to my client. Correct?
A. Correct.
Q. What address was that sent to?
A. 410 South Hobart Boulevard, Apartment 214.
Q. And that's in Los Angeles, right?
A. Yes.
Q. Once you sent that out, you noted your Excel spreadsheet and then you did nothing on the account until you obtained the identity theft packet back from Mr. Kim. Correct?
A. Correct.
Q. Okay. What did you get back from Mr. Kim?
A. Do we have a copy of that?
Q. Would it be noted in your account notes what you received from Mr. Kim?
A. No. I mean, it would be attached, but not detailed out in the account notes.

**Page 101**

Q. Let me ask you, do you recall receiving a police report from Mr. Kim?
A. Yes.
Q. What about the completed identity theft affidavit?
A. Yes.
Q. A driver's license copy?
A. Yes.
Q. And let's see here. Okay. Did he provide you a copy of his social security card?
A. Yes.
Q. Did he provide you proof of his residency at the time that the fraud was committed?
A. Yes.
Q. And do you recall in what form that was?
A. An apartment lease.
Q. Okay. Is there anything else that you received other than the notarized affidavit, the police report, the proof of residency, and the driver's license and social security card?
A. He also sent a printout of an Experian report.
Q. And that would be the Experian credit report?
A. Yes.
Q. And he highlighted information on there or he circled information that didn't belong to him on that

**Page 102**

1  report; is that right?
2  A.   According to him, yes.
3  Q.   Right. And one of those trade lines that he
4  circled was the BMW Financial Services trade line. Correct?
5  A.   Correct.
6  Q.   Okay. Did you ask him for a credit report?
7  A.   No.
8  Q.   Did the credit report assist you in your
9  investigation at all?
10 A.   No.
11 Q.   Okay. How come?
12 A.   It really doesn't provide any other information
13 regarding his vehicle with us. That's what I was
14 investigating. So the other accounts that show up on his
15 bureau aren't considered in my investigation.
16 Q.   The copy of the driver's license that Mr. Kim
17 provided you, was it a legible copy of his driver's license?
18 A.   Yes.
19 Q.   So you get this information from Mr. Kim. What's
20 the very -- in excruciating detail, which is what we'll also
21 do after lunch. But I want to know exactly what you did
22 when you received that information from Mr. Kim. What's the
23 next thing that you did?
24 A.   After I scanned it in and --

**Page 103**

1  Q.   So you get the information, and you then scan it
2  into the system?
3  A.   Correct.
4  Q.   So there is an electronic version of all the
5  information that he sent. Correct?
6  A.   Correct.
7  Q.   Okay. And the documents, did he send them in over
8  fax or was it through the mail?
9  A.   Through the mail.
10 Q.   Okay. And you received them when?
11 A.   September 23rd, 2013.
12 Q.   Okay. Was it an issue that it took, whatever, a
13 week and a half to get to you? Did that concern you at all?
14 A.   No.
15 Q.   Is that fairly typical in identity theft
16 investigations that these responses come in a week or two
17 later?
18 A.   Yes.
19 Q.   Okay. So on September 23rd, you receive a
20 document from Mr. Kim -- you received a set of documents,
21 you scanned them into the system, and then you keep the hard
22 copy in the manila file folder that you've just created on
23 your desk. Is that fair?
24 A.   Correct.

**Page 104**

1  Q.   Okay. What happened next?
2  A.   Then I would send him a letter advising him that
3  we received his packet and that we will begin our
4  investigation.
5  Q.   Okay. And that letter would have been when?
6  A.   September 23rd, 2013.
7  Q.   Okay. I'm going to show you what I'm marking as
8  Exhibit No. 4.
9        ---
10       And, thereupon, Deposition Exhibit No. 4 was
11 marked for purposes of identification.
12       ---
13 BY MS. TATER:
14 Q.   And just for the record, Exhibit No. 3, you
15 recognize that document. Correct?
16 A.   Correct.
17 Q.   And that's a document that's kept in the regular
18 course of business here at BMW?
19 A.   Correct.
20 Q.   And this is the document -- did you sign this
21 document?
22 A.   No.
23 Q.   Do you ever sign the letters that you send out?
24 A.   Sometimes. It just depends on the situation.

**Page 105**

1  Q.   But this document, it shows that your name is at
2  the bottom. So you were the individual responsible for at
3  least generating the request to send the document. Correct?
4  A.   Correct.
5  Q.   Okay. Let's go to Exhibit No. 4. I'm going to
6  show you that. Do you recognize that document?
7  A.   Yes.
8  Q.   And what is that?
9  A.   That is confirming the receipt of his packet.
10 Q.   It seems to be a very similar letter to the
11 September 10th letter except for the second paragraph. Is
12 that a document that you drafted yourself?
13 A.   It's a template.
14 Q.   So you input the person's name?
15 A.   Yes.
16 Q.   And address?
17 A.   Correct.
18 Q.   And I'm assuming the date is probably
19 automatically populated. Correct?
20 A.   Correct.
21 Q.   And then you also then have to put in the
22 vehicle's year, make, and model and the account number.
23 Correct?
24 A.   Correct.

| Kim vs. BMW | Deposition of Angela Jarosik |

**Page 166**

        MS. CALEY: Okay. Wait a minute. You're presuming a lot. You're presuming that it's not one of these documents. You're asking her -- she is here to talk about the fraud identification. Jenny Livingston has not been examined yet.
        So don't presume what you don't know. So there -- you have been very restrictive of what documents she can look at. She's not that witness. She's not the witness for the name of the account.
        MS. TATER: Did you produce that document or not? You didn't. Because the only documents we have are the account notes and call log notes and then this investigation and the letters.
        MS. CALEY: I am not the witness. If you want to take the time, we can stop and go through all of the document requests and reconcile. But you do not get to presume and conclude without completing all of your -- all of the depositions. So you're just making a presumption and you're objecting and just making conclusions and testifying here.
        MS. TATER: Okay. Thank you for your speaking objection.
BY MS. TATER:

**Page 167**

Q.  Let's go to Exhibit No. 9.
        ---
        And, thereupon, Deposition Exhibit No. 9 was marked for purposes of identification.
        ---
BY MS. TATER:
Q.  Do you see recognize that document?
A.  Yes.
Q.  What is it?
A.  That's the credit application provided at the time of -- when the customer signed.
Q.  And is that one of the documents you reviewed during your investigation?
A.  Yes.
Q.  What is the person's first name on that document?
A.  Seung.
Q.  What is the person's middle name?
A.  I don't know.
Q.  Not listed?
A.  It's an initial.
Q.  What's the initial?
A.  "T".
Q.  And then what's the last name?
A.  It's -- oh, Kim.

**Page 168**

Q.  Okay. Thank you. That was difficult. Okay. Did you, during your investigation, believe that you needed any additional documentation from my client in order to conduct your investigation?
A.  No.
Q.  You felt you had everything that you needed in order to come to a conclusion?
A.  Correct.
Q.  Okay. And every document that BMW asked for, my client provided. Correct?
A.  Correct.
Q.  Did you get the impression that my client wasn't cooperating with your investigation?
A.  I'm sorry?
Q.  Did you get the impression that my client wasn't cooperating with your investigation?
        MS. CALEY: Objection. Calls for speculation.
A.  No.
BY MS. TATER:
Q.  Okay. Did you make a determination or did you have any opinions during your investigation as to whether or not my client was cooperating with law enforcement in their investigation of identity theft?

**Page 169**

A.  What was the question?
Q.  Did you make an opinion or have an opinion during the course of your investigation as to whether or not my client was cooperating with law enforcement with respect to his police report and identity theft?
        MS. CALEY: Objection. Calls for speculation.
        If you know.
        MS. TATER: I'm asking if she made an opinion. It's not speculative.
A.  Yes.
BY MS. TATER:
Q.  You had an opinion?
A.  Yes.
Q.  And what was that opinion?
A.  That because he did not name Mr. Kim on the police report, that it did not validate his claim that Mr. Kim actually stole his information.
Q.  Do you think that was an important fact in determining that he was a straw purchaser?
A.  Yes.
Q.  Is there any one fact that you think is the strongest fact that led you to believe that he was a straw purchaser?