Robert F. Brennan, Esq. [S.B. #132449]
**LAW OFFICES OF ROBERT F. BRENNAN, A P.C.**
3150 Montrose Ave.
La Crescenta, CA 91214
Tel.: (818) 249-5291
Fax: (818) 249-4329
Email: rbrennan@brennanlaw.com

Stephanie R. Tatar, Esq. [S.B. #237792]
**TATAR LAW FIRM, APC**
3500 West Olive Ave., Ste. 300
Burbank, CA 91505
Tel.: (323) 744-1146
Fax: (888) 778-5695
Email: stephanie@thetatarlawfirm.com

Attorneys for Plaintiff SEUNGTAE KIM

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SEUNGTAE KIM, an Individual,

Plaintiff,

vs.

BMW FINANCIAL SERVICES NA, LLC., et al.,

Defendants.

Case No. 2:14–cv–1752–BRO (JCx)
Hon. Beverly Reid O'Connell

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT BMW FINANCIAL SERVICES' MOTION FOR A NEW TRIAL UNDER RULE 59**

[Filed concurrently with Combined Declaration of Robert F. Brennan with Exhibits.]

Date: November 2, 2015
Time: 1:30 p.m.
Courtroom: 14

Trial Date: Passed (Aug. 25, 2015)

## TABLE OF CONTENTS


I. INTRODUCTION ....................................................................................1

II. STATEMENT OF FACTS..........................................................................1

III. ARGUMENT...........................................................................................1

A. STANDARD FOR RULE 59 NEW TRIAL MOTIONS.............................1

B. THE DAMAGES AWARDED PLAINTIFF ARE NOT EXCESSIVE AND ARE SUPPORTED BY THE EVIDENCE............................................2

1. Plaintiff Offered Substantial Evidence to Support the Award for Damage to Reputation and Creditworthiness Under the Fair Credit Reporting Act....................................................4

C. THE VERDICT IS SUPPORTED BY THE EVIDENCE AND IS NOT UNCONSCIONABLE...........................................................................9

1. Violation of the Fair Credit Reporting Act...........................................9

2. Violation of the California Identity Theft Law.................................10

(a) The Evidence Weighs Heavily in Favor of Plaintiff Not Having Authorized the Purchase of the Vehicle..................10

(b) There Was Not a Significant Change in Plaintiff's Testimony at Trial.........................................................................14

(c) Plaintiff Presented Sufficient Evidence Supporting he Damages Award.................................................................20

(d) Plaintiff Presented Sufficient Evidence to Support the Civil Penalty Under the Identity Theft Law.........................21

D. THE COURT DID NOT ERR IN GIVING OR REFUSING TO GIVE ANY JURY INSTRUCTIONS. ....................22

1. The Jury Did Not Have to be Given an Instruction that Plaintiff Could Not Recover Damage Under the FCRA for a Dispute Made Directly with Defendant....................22

2. The Jury Did Not Have to be Given an Instruction on How a Determination of a "Reasonable Investigation" is Made Under the Fair Credit Reporting Act....................22

IV. CONCLUSION....................23

///

///

///

# TABLE OF AUTHORITIES

## Cases

*Anglo-American General Agents v. Jackson Nat. Life Ins. Co.*, 83 F.R.D. 41 (N.D. Cal. 1979)....................2

*Barbara Novinger Jorgensen v. TRW, Inc., et al.*, Case No. CV96-286-JE, 98 Or.Lit.Arb.Rpts. 189, 1998 WL 548741 (U.S. Dist. Ct. Or. July 14, 1998)...........3

*Brady v. Gebbie*, 859 F.2d 1543 (9th Cir. Or. 1988)....................2

*Decorations for Generations, Inc. v. Home Depot USA, Inc.*, 2003 U.S. Dist. LEXIS 26608 (E.D. Cal. Sept. 19, 2003)....................3

*Del Monte Dunes v. City of Monterey*, 95 F.3d 1422 (9th Cir. Cal. 1996)....................2

*DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213 (9th Cir. Cal. 2010)....................1, 2, 9, 14

*Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 71 L.Ed. 684, 47 S.Ct. 400 (1927)....................3

*Eric Robert Drew v. Equifax Information Services, et al.*, 2010 WL 4307431 (U.S. Dist. Ct. N.D. Cal. August 02, 2010)....................3

*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147 (9th Cir. Cal. 2009)........22, 23

*Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329 (9th Cir. Cal. 1995)....................4

*Gustafson v. Experian Info. Solutions, Inc.*, 2015 U.S. Dist. LEXIS 71280 (C.D. Cal. June 2, 2015)....................23

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979)....................5

*Johnson v. ABLT Trucking Co.*, 412 F.3d 1138 (10th Cir. Kan. 2005)....................20

*Johnson v. Wells Fargo Home Mortg., Inc.*, 558 F.Supp.2d 1114 (D. Nev. 2008)......9

*Judy Thomas v. Trans Union*, Case No. 00-1150-JE (U.S. Dist. Ct. Ore. July 22, 2002)....................3

*Julie Miller v. Equifax Information Services, LLC*, Case No. 3:11-cv-01231-BR (U.S. Dist. Ct. Ore. July 23, 2013)....................3

*Levka v. City of Chicago*, 748 F.2d 421 (7th Cir. 1984)....................3

*Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400 (9th Cir. 1993)....................3

*Los Angeles Memorial Coliseum Comm'n v. NFL*, 791 F.2d 1356 (9th Cir. 1986).....2

*Munafo v. Metro. Transp. Auth.*, 381 F.3d 99 (2nd Cir. N.Y. 2004)....................20

*Santa Cruz v. Small*, 625 F.Supp.2d 930 (C.D. Cal. 2008)....................5

*Siemons v. First U.S.A. Bank, N.A.*, 2008 WL 2221873 (Cal.Sup. 2008)....................3

*Smith v. LexisNexis Screening Solutions Inc.*, 2015 U.S. Dist. LEXIS 131962 (E.D. Mich. Sept. 30, 2015)....................6

*Soghomonian v. Trans Union LLC*, 2003 WL 25859527 (E.D.Cal. 2003)....................3

*United States v. DiMarzo*, 80 F.3d 656 (1st Cir. 1996)....................6

*United States v. Jones*, 580 F.2d 219 (6th Cir. 1978)....................6

*United States v. Tin Yat Chin*, 275 F. Supp. 2d 382 (E.D.N.Y. 2003)....................6

*Walters v. Maass*, 45 F.3d 1355 (9th Cir. Or. 1995)....................5

**Statutes**

15 U.S.C. § 1681 et seq....................1

15 U.S.C. § 1681s-2(b)(1)(E), (b)(2)....................5

*Civil Code* § 1785.1 et seq....................1

*Civil Code* § 1798.92 et seq....................1

*Civil Code* § 1798.93(c)(6)(A)-(C).........................................................................21

**Other**

Fed. R. Civ. P., Rule 59........................................................................................1

///

///

///

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Contrary to the argument of Defendant BMW Financial Services, NA, LLC ("Defendant" or "BMWF"), the damages awarded by the jury to Plaintiff Seungtae Kim are not excessive or solely based upon speculation and guesswork. Sufficient evidence supports the verdict. Nor can the verdict be considered inconsistent. Finally, there were no instructional errors. For the reasons discussed herein, Defendant's motion for a new trial should be denied.

## II. STATEMENT OF FACTS

This action arises out of wrongful credit reporting by Defendant BMWF of a car loan taken out using Plaintiff Seungtae Kim's identity without his knowledge. Plaintiff's Complaint states four causes of action, three of which were at issue against BMWF at trial: First Cause of Action for violation of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.; Second, for violation of the California Identity Theft Law, *Civil Code* § 1798.92 et seq.; and Fourth, for violation of the California Consumer Credit Reporting Agencies Act ("CCRAA"), *Civil Code* § 1785.1 et seq.

At trial, Plaintiff prevailed on the FCRA and Identity Theft Law claims. Judgment was entered on September 9, 2015 for $250,000 on the FCRA claim, and $150,000 plus a civil penalty of $30,000 on the Identity Theft Law claim.

## III. ARGUMENT

### A. STANDARD FOR RULE 59 NEW TRIAL MOTIONS.

The Court in *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. Cal. 2010) summarizes the standard for ruling on a motion for new trial under Rule 59:

> "A district court may grant a new trial only if the jury verdict is contrary to the clear weight of the evidence. . . A jury's verdict must be upheld if

> it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, **even if it is also possible to draw a contrary conclusion.** We must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor. A jury verdict should be set aside only when the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."

*Id.*, (bold added; internal quotation marks omitted).

The burden of demonstrating necessity of new trial is on the moving party. *Anglo-American General Agents v. Jackson Nat. Life Ins. Co.*, 83 F.R.D. 41, 43 (N.D. Cal. 1979).

## B. THE DAMAGES AWARDED PLAINTIFF ARE NOT EXCESSIVE AND ARE SUPPORTED BY THE EVIDENCE.

The jury's award of damages in this matter were appropriate given the gravity of the injury and the callous indifference with which BMWF carried out its responsibilities under the Fair Credit Reporting Act and the California Identity Theft Law. A jury's finding on the amount of damages will be upheld unless the amount is "grossly excessive or monstrous" or clearly not supported by the evidence. *Del Monte Dunes v. City of Monterey*, 95 F.3d 1422 (9th Cir. Cal. 1996). Courts allow substantial deference to a jury's finding of the appropriate amount of damages. *Los Angeles Memorial Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1360 (9th Cir. 1986), cert. denied, 484 U.S. 826, 108 S. Ct. 92, 98 L.Ed. 2d 53 (1987). The damages award must be affirmed unless it is "shocking to the conscience." *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. Or. 1988). BMWF has failed to meet these tests in challenging the amount of damages awarded.

The damages awarded Plaintiff were within the bounds of the jury instructions given. The U.S. Supreme Court has held that "damages are not rendered uncertain

because they cannot be calculated with absolute exactness." *Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 379, 71 L.Ed. 684, 47 S.Ct. 400 (1927); quoted in *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407-08 (9th Cir. 1993). A degree of uncertainty is acceptable in calculating something as amorphous as loss of reputation. *Decorations for Generations, Inc. v. Home Depot USA, Inc.*, 2003 U.S. Dist. LEXIS 26608, *23 (E.D. Cal. Sept. 19, 2003).

One factor the Court may consider in determining whether an award is excessive is whether the award is "out of line compared to other awards in similar cases." *Levka v. City of Chicago*, 748 F.2d 421, 425 (7th Cir. 1984). There have been similar and substantially larger awards in other FCRA cases. See, e.g.: *Eric Robert Drew v. Equifax Information Services, et al.*, Case No. 3:07-cv-00726-SI, 2010 WL 4307431 (U.S. Dist. Ct. N.D. Cal. August 02, 2010) (**$1,021,327**); *Judy Thomas v. Trans Union*, Case No. 00-1150-JE (U.S. Dist. Ct. Ore. July 22, 2002) (**$300,000** in compensatory damages); *Barbara Novinger Jorgensen v. TRW, Inc., et al.*, Case No. CV96-286-JE, 98 Or.Lit.Arb.Rpts. 189, 1998 WL 548741 (U.S. Dist. Ct. Or. July 14, 1998) (**$600,000** for damage to reputation and emotional distress), and *Julie Miller v. Equifax Information Services, LLC*, Case No. 3:11-cv-01231-BR (U.S. Dist. Ct. Ore. July 23, 2013) (**$180,000** in compensatory damages).

The $150,000 in noneconomic damages (emotional distress) awarded Plaintiff is also in line with other cases. See e.g., *Siemons v. First U.S.A. Bank, N.A.*, 2008 WL 2221873 (Cal.Sup. 2008) (**$400,000** for emotional distress for identity theft victim denied recovery against debt collectors); *Soghomonian v. Trans Union LLC*, 2003 WL 25859527 (E.D.Cal. 2003) (**$614,900** for emotional distress for false credit reporting); and *Barbara Novinger Jorgensen v. TRW, Inc., et al.*, *supra*, (**$600,000** for emotional distress and damage to reputation).

///

///

///

**1. Plaintiff Offered Substantial Evidence to Support the Award for Damage to Reputation and Creditworthiness Under the FCRA.**

Contrary to BMWF's assertions, Plaintiff offered substantial evidence to support the damages awarded for injury to reputation and creditworthiness. BMWF offers the same arguments made in support of its accompanying motion for judgment as a matter of law. (Motion for New Trial, P&As, p. 5, line 1 – p. 8, line 12.) Accordingly, Plaintiff's argument here mirrors the opposition to that motion.

Plaintiff's closing argument discussed the importance of reputation and creditworthiness to a doctor trying to build a professional practice in our country. Plaintiff's closing argument also discussed the many ways in which both individuals and corporations act, sometimes at great expense, to protect reputation and creditworthiness. (Transcript, Vol. 3, 603:18-604:25) The value of reputation or creditworthiness may at times be hard to quantify, but there is little doubt that these are *extremely valuable* commodities to both individuals and corporations, and the jury recognized this with an eminently reasonable assessment of damages.

**As a matter of law, BMWF is incorrect that plaintiff need establish a denial of credit to establish damage to his credit reputation or creditworthiness.** In the Ninth Circuit, a denial of credit is not a prerequisite to recovery under the FCRA. *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. Cal. 1995). If BMWF had wanted the jury to follow such an instruction regarding denial of credit, it could have proposed it and argued for it, but it would have been contrary to law. *Guimond*, *supra*. BMWF's failure to request the instruction should be regarded as a waiver of the argument.

**Factually, there is ample evidence in the record that BMWF's derogatory tradeline ruined Plaintiff's reputation and creditworthiness.** BMWF argues that it was Plaintiff's burden to establish that Plaintiff's credit denials occurred after BMWF completed its investigation, which, per BMWF, occurred on October 30, 2013. BMWF's calculation of the completion date for its reinvestigation under the FCRA is

incorrect. Under the FCRA, BMWF completes its reinvestigation when it responds to the ACDV from any major credit bureau, instructing the bureau to either confirm the credit information, modify it, block it or delete it. 15 U.S.C. § 1681s-2(b)(1)(E), (b)(2).

BMWF's records in evidence show that its first ACDV response to the credit bureaus—verifying both the account and the derogatory credit information as belonging to Seungtae Kim—occurred on September 18, 2013. (Trial Exhibit 108, p. 6, 5th entry from top; see also Alison Parillo testimony, Trial Transcript, vol. 3, 533:6-14.)[1] Experian, not BMWF, removed BMWF's derogatory tradeline on May 17, 2014. (Stipulation, Trial Transcript, vol. 1, 19:16-18.) Throughout a four-day trial, BMWF never provided evidence that it ever modified or suppressed the negative reporting of the account. So, for a period of between eight and nine months, Plaintiff's credit report bore the derogatory reporting from BMWF.

Since Experian, not BMWF, removed the BMWF derogatory from his credit report in May of 2014, Plaintiff has not been denied credit. (Trial Transcript, vol. 2, 313:18-314:4.) In other words, Plaintiff was only denied credit while the BMWF derogatory appeared on his tradeline.

The Court instructed the jury that it could rely on both direct and circumstantial evidence. Jury Instruction No. 7. (Brennan Decl., Exhibit 5.) Further, the law is clear that a jury is permitted to draw reasonable inferences from the evidence presented. The Court must respect the province of the jury to draw reasonable inferences from the facts. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979); *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. Or. 1995); *Santa Cruz v. Small*, 625 F.Supp.2d 930 (C.D. Cal. 2008).

---

[1] The excerpts from the four volumes of the Trial Transcript are attached to the accompanying Brennan Declaration as Exhibits 1 through 4, corresponding to Volumes 1 through 4.

"Furthermore, a jury is permitted to apply its common sense and draw on its own real-world experiences in reaching its conclusions. E.g., *United States v. Jones*, 580 F.2d 219, 222 (6th Cir. 1978) ('[J]ury may properly rely upon its own knowledge and experience in evaluating evidence and drawing inferences from that evidence . . . .'); *United States v. DiMarzo*, 80 F.3d 656, 661 (1st Cir. 1996) ('As we repeatedly have recognized, a jury is free to rely on its common sense . . . .'); *United States v. Tin Yat Chin*, 275 F. Supp. 2d 382, 384 (E.D.N.Y. 2003) ('Jurors are permitted and expected to bring to their deliberations common knowledge drawn from their life experiences.')." *Smith v. LexisNexis Screening Solutions Inc.*, 2015 U.S. Dist. LEXIS 131962, *18 (E.D. Mich. Sept. 30, 2015).

Based on the facts in the record, the following inferences can reasonably be drawn:

1. The jury could reasonably infer that Seungtae Kim's reputation and creditworthiness were damaged–severely, in fact–by the presence of the BMWF derogatory tradeline on his credit report. Plaintiff's expert Thomas A. Tarter testified that a repossession or a 90-day late—the two derogatory marks which BMWF used for reporting on Mr. Kim's credit report, are both very serious derogatories. (Trial Transcript, vol. 1, 187:5-188:16.)
2. Before the identity theft, Plaintiff's credit was good enough to qualify to purchase not just one, but *at least three* cars: Plaintiff's own car, the BMW from Shelley BMW and either one or two cars which Mike Kim purchased using Plaintiff's identity through Kia Financial. (Transcript, vol. 1, 129:4-6—plaintiff's credit good enough to purchase car at Shelley BMW; Transcript, 276:4-278:25—plaintiff discovered ID theft when he learned that there were two more cars financed by Kia Financial under his social security number.)
3. Further, *Plaintiff never missed any payment to any creditor at any time,* a fact in evidence not disputed by BMWF. (Transcript, vol. 2, 312:21-23.)

4. The jury could reasonably infer that sustaining three straight credit denials in 2013 hampered and discouraged Plaintiff from pursuing other credit opportunities, until Experian finally cleansed Plaintiff's credit report in late May of 2014.
5. The jury could reasonably infer that the BMWF derogatory tradeline was at least a substantial factor, if not the only factor, in Plaintiff's sustaining credit denials. Per Plaintiff's testimony, the other tradelines came off of his credit report promptly after he contacted the other furnishers. The court instructed the jury that Plaintiff need not prove "but-for" causation, but only need prove "substantial factor" causation. Jury Instruction No. 31. (Brennan Decl., Exhibit 5.) Mr. Tarter's identification of the BMWF derogatory reporting "as very serious" creates the immediate inference that the BMWF derogatory was at least a substantial contributing factor, and likely the single most important contributing factor, in any credit denials which Plaintiff suffered. (Trial Transcript, vol. 1, 187:16-188:13.)
6. Mr. Kim testified that the three credit denials occurred <u>after</u> the BMWF tradeline appeared on his credit report, but he could not recall the exact dates. (Trial Transcript, vol. 2, 312:24-314:4.) Mr. Kim testified that he did not discover the BMWF tradeline on his credit report until August or September of 2013, when he checked his credit report in response to notification from Kia Financial that he had additional cars on his Kia Financial account. (Trial Transcript, vol. 2, 276:4-278:17.) This testimony, combined, narrows down the period in which the credit denials could have occurred to four months only: September through December in 2013.
7. Supporting this is the reasonable inference that, had Plaintiff been denied credit any earlier in 2013, he would have begun his investigation sooner that led to the discovery of the identity theft accounts, as well as his efforts to correct these credit errors. The undisputed testimony is that Plaintiff's efforts to

cleanse his credit reports of the identity theft accounts began in early September, 2013, which indicates that, most likely, one or more of the credit applications and the credit denials occurred after that time.

8. BMWF's records show that its first ACDV response to the credit bureaus—verifying both the account and the derogatory credit information as belonging to Seungtae Kim—occurred on September 18, 2013. (Trial Exhibit 108, p. 6, 5th entry from top.) Absent specific information about the dates, the jury could reasonably infer that at least one, and possibly all, of the denials occurred after BMWF had responded to its first ACDV. The period between Plaintiff's discovery of the BMWF tradeline and BMWF's first ACDV response is not more than 18 to 20 days in the first part of September, 2013. The jury could very reasonably infer that Plaintiff more likely applied for credit during the 100+ days remaining of 2013 following BMWF's ACDV response rather than the 20-odd days preceding it.

9. When Plaintiff learned of the identity theft accounts on his credit report, he acted promptly to have them removed. He successfully removed all but one of the identity theft accounts: the BMWF account. It is a reasonable inference that since the other identity theft furnishers who were reporting on Plaintiff cleansed their tradelines promptly, Plaintiff applied for credit only after he had done as much as he could to correct his credit report, which would most likely have been after September 18, 2013. In other words, he only shopped for credit after he had exhausted his efforts to have the identity theft accounts removed.

10. Under the Court's Jury Instruction No. 2, Plaintiff had the burden of proving that the elements of his claims were "more probably true than not." (Brennan Decl., Exhibit 5.) Since Plaintiff applied for credit *in person* (not online and not through the mail) on the three occasions in late 2013, he did not have documentation of when the credit denials occurred. However, one or more of these was most likely after he had engaged the credit bureaus and furnishers to

cleanse his credit. The opposite inference—that he applied for credit before he had exhausted his best efforts to correct his credit report—makes little sense: why would a credit-conscious doctor, with otherwise perfect credit, apply for credit before exhausting his best efforts to correct his credit report? Someone with otherwise perfect credit would most likely do everything possible to correct any false entries before applying for credit. This is both a reasonable inference, based on the facts in the record, and is more probably true than the opposite conclusion.

11. To the extent that BMWF's argument is considered an affirmative defense to Plaintiff's damages claims, BMWF bore the burden of demonstrating that the credit denials occurred before it had completed its first ACDV reinvestigation. BMWF failed to produce any such evidence.

Defendant offers no specific argument that the amount of the verdict "shocks the conscience," or that it arose out of passion, prejudice, or bias. There is sufficient evidence supporting the jury's verdict. Plaintiff need only prove that the evidence is "adequate to support the jury's conclusion," which it is. *DSPT Int'l, Inc. v. Nahum*, *supra*, at 1218.

**C. <u>THE VERDICT IS SUPPORTED BY THE EVIDENCE AND IS NOT UNCONSCIONABLE.</u>**

**1. <u>Violation of the Fair Credit Reporting Act.</u>**

Defendant relies upon *Johnson v. Wells Fargo Home Mortg., Inc.*, 558 F.Supp.2d 1114, 1123 (D. Nev. 2008), in arguing that Plaintiff should be required to produce the consumer report relied upon by those companies which denied Plaintiff credit. (Def. P&As, p. 9, lines 13 – 24.) The discussion of a "consumer report" in *Johnson* is within the context of the plaintiff in that case having damages that were for business or commercial transactions. *Id.* at 1122. The discussion above establishes

that sufficient evidence supported a causal connection between the credit reports containing BMWF's derogatory and the denial of credit.

**2. <u>Violation of the California Identity Theft Law.</u>**

**(a) <u>The Evidence Weighs Heavily in Favor of Plaintiff Not Having Authorized the Purchase of the Vehicle.</u>**

Defendant argues that the Power of Attorney authorized Mike Kim's purchase of the vehicle using Plaintiff's personal information. (Def. P&As, p. 10, line 16 – p. 11, line 7.) Plaintiff fully refuted Defendant's argument on this point in the accompanying opposition to Defendant's motion for judgment as a matter of law. Plaintiff's argument is repeated here.

**Mike Kim's testimony was not credible.** Contrary to BMWF's argument, legally sufficient evidence was presented at trial to establish that Plaintiff did not authorize the identity thief, Mike Kim, to purchase the vehicle. Mike Kim admitted that he alone prepared the Power of Attorney. (Trial Transcript, vol. 3, 348:19-349:1, vol. 3, 439:7-10.) Plaintiff testified at trial that he never gave Mike Kim permission to use his personal information to buy a car. (Trial Transcript, vol. 2, 364:24-365:2.) Plaintiff testified that he never signed a Power of Attorney giving Mike Kim permission to buy a car using his personal information and that the first time Plaintiff ever saw Exhibit 101 was at his deposition in this case in February of 2015. (Trial Transcript, vol. 2, 272:14-25.)

Mike Kim admitted that his credit was "really bad."(Trial Transcript, vol. 3, 437:14-15.) A reasonable jury would obviously conclude that Plaintiff would not give Mike Kim carte blanche to purchase any vehicle he wished using Plaintiff's personal information, especially in light of the fact that the relationship between Plaintiff and Mike Kim was "not good" after June of 2009. (Trial Transcript, vol. 2, 370:1-5.)

Mike Kim testified that he went to the Shelly BMW dealership to purchase a 2007 certified pre-owned BMW 3 series. (Trial Transcript, vol. 3, 441:5-14.) Mike Kim signed Plaintiff's signature at least 23 times on the car-purchase documents, presenting himself as being Seungtae Kim. ***Mike Kim admits that he signed Exhibit 24, a Shelly BMW Statement of Facts, under penalty of perjury that all of the signatures were Seungtae Kim's.*** (Trial Transcript, vol. 3, 452:2-16.) They obviously were not.

Mike Kim testified that, while he was signing all of these documents with Plaintiff's name, no one at Shelly BMW asked to see his personal identifying information. Nor did Mike Kim recall the finance manager bringing up the Power of Attorney at any time. (Trial Transcript, vol. 3, 454:4-6 & 442:19-443:3.) This simply would not pass the smell test of a reasonable jury, that Shelly BMW would not bother to check a person's identifying information while negotiating the sale of a car for over $30,000.

A plausible inference here is that Shelly BMW asked him for identifying information and Mike Kim, impersonating Seungtae Kim, gave them a copy of Plaintiff's driver's license which he had obtained previously under the guise of helping Plaintiff obtain a job and a green card. A reasonable jury could certainly view the Power of Attorney story as a mere fiction fabricated by Mike Kim.

The Shelly BMW finance manager, Nick Nguyen, confirmed that there was no Power of Attorney contained in the Shelly BMW documentation produced in response to a subpoena. (Trial Transcript, vol. 1, 125:5-12.) Moreover, as Mr. Nguyen pointed out, Shelly BMW does not sell cars under a Power of Attorney. The only exception would be for military personnel, and a military Power of Attorney would have been in the deal file. (Trial Transcript, vol. 1, 141:15-22; 149:5-22; 154:11-15.) Mr. Nguyen also testified certain documents prepared during the course of the sale must be signed by the purchaser, and not by way of a power of attorney,

including the Federal Odometer Disclosure Statement, as mandated by the California Department of Motor Vehicles. (Trial Transcript, vol. 1, 141:4-6.)

Mike Kim testified that he supplied the information for the BMW Financial Services credit application, stating that his employer was Xpert Fertility. When questioned about this, Mike Kim admitted it was not accurate: "Well, technically I didn't really work for them because I was more like an independent contractor." (Trial Transcript, vol. 3, 443:22-444:6; Trial Exhibit 102.) However, Dr. Ho, who owns Xpert Fertility, flatly contradicted Mike Kim's testimony and the information he supplied for Exhibit 102, the BMW Financial Services credit application. Dr. Ho unequivocally testified that: he never employed Mike Kim; he never paid Mike Kim $102,000 a year; Mike Kim was never a manager at Xpert Fertility; and he had never before seen Seungtae Kim. (Trial Transcript, vol. 3, 557:14-558:17.) ***In short, all of this information that Mike Kim provided on the credit application regarding Xpert Fertility was completely fabricated.***

**The Power of Attorney form had misaligned text, indicating that it had been prepared at more than one sitting.** Forensic document examiner Bruce Greenwood found, as to the typewriting on the Power of Attorney, that the date was not in the same alignment as the rest of the text. (Trial Transcript, vol. 2, 243:15-21.) He determined this by using typewriter grids. (Trial Transcript, vol. 2, 243:22-24, 245:8-10; Trial Exhibits 81-3 & 81-4.) The misalignment of the date created a question in Mr. Greenwood's mind as to whether the date was added to this document at a different sitting than the text of the document. (Trial Transcript, vol. 2, 245:11-16.) He also pointed out that, if you have a signature on a blank piece of paper, using a computer and a scanner, it would be a fairly easy task to add text to it. (Trial Transcript, vol. 2, 247:13-248:14.)

**Mike Kim had had Plaintiff sign several documents under the false representation that the documents would help Plaintiff get a job or a green card.** Plaintiff testified that when he first entered into a contract with Mike Kim in Denver, he signed about ten documents. He believed that the documents had to do with his employment and obtaining a green card, but Plaintiff was not able to read them at the time. (Trial Transcript, vol. 2, 260:10-23.) Around the end of 2008, Mike Kim had Plaintiff sign another approximately four documents; Mike Kim did not give him a chance to read the documents. (Trial Transcript, vol. 2, 263:8-264:21.) Given all of the above, a reasonable jury could plausibly infer that Mike Kim possessed an otherwise blank piece of paper containing Plaintiff's signature which he subsequently used to fabricate the phony Power of Attorney.

Plaintiff also testified that Mike Kim asked him in June 2009 to use his personal information to buy a car and Plaintiff refused. In 2011, Mike Kim again asked Plaintiff to use his personal information to buy a car, and again Plaintiff refused. (Trial Transcript, vol. 2, 268:6-18 & 269:8-270:1.) Mike Kim asked Dr. Seo about seven or eight times to use his personal identification to purchase a car. On each occasion Dr. Seo refused. (Trial Transcript, vol. 2, 370:2-371:11.) In the face of this, it is again a reasonable inference that Mike Kim engaged in fraudulent tactics with the Power of Attorney in order to purchase a car.

What emerges from the evidence is a picture of Mike Kim as a sponge in desperate financial straits, and a man who has scant regard for the truth. Taking into account that Mike Kim forged 23 signatures on the Shelly BMW car purchase documents, and even signed under penalty of perjury that he was Seungtae Kim and that all of the other purchase documents were signed by Seungtae Kim, there is sufficient evidence for a reasonable jury to conclude that Mike Kim created a doctored Power of Attorney with the intention of fraudulently purchasing the vehicle without Plaintiff's knowledge or consent. It would be readily apparent to a reasonable jury that Mike Kim had to go to extraordinary lengths to avoid having Mike Kim

involved in the transaction because Mike Kim knew he would have flatly refused. In the face of the overwhelming evidence presented of the identity theft, BMWF's argument appears specious.

**(b) There Was Not a Significant Change in Plaintiff's Testimony at Trial.**

Defendant calls into question the credibility of Plaintiff's testimony at trial. (Def. P&As, p. 11, line 8 – p. 14, line 28.) While the Court may assess the credibility of a witness in the context of determining if the verdict was against the clear weight of the evidence, the Court must view the testimony in the light most favorable to Plaintiff, and if the evidence is adequate, the jury verdict cannot be overturned even if a contrary conclusion could be drawn. *DSPT Int'l, Inc. v. Nahum*, *supra*, at 1218.

Defendant enumerates eight so-called "discredited claims." Defendant addresses these claims with a distorted version of some of the trial testimony, fallacious reasoning, twisted (and sometimes invented) facts, and inapposite citations. Much of Defendant's argument in this regard could best be described as "much ado about nothing," straining and splitting hairs in an effort to falsely suggest that Plaintiff was not being truthful at trial.

(1) Defendant's first "discredited claim" purports to paraphrase the testimony of expert forensic document examiner Bruce Greenwood to the effect that the title and text of the Power of Attorney was on the document (Exhibit 101) at the time of the signature. Defendant's rendition misstates the testimony, misstates the facts, omits facts, and is hearsay.

Defendant relies upon a clumsy citation to the Trial Transcript to support its argument: "Page Nos. 416-418, Vol. I and Page Nos. 416-418 Vol. II and Exhibit '101' attached to Appendix as Item No.2." Page numbers 416-418 are not in Vol. I or II, but are contained in Vol. III. Defendant omits line-number references. When one

examines the actual text, page 416 starts with a question from the Court, and page 418 ends mid-sentence with a question from Ms. Caley to Frank Hicks. This is testimony of Mr. Hicks, and nowhere is Mr. Greenwood's testimony even referenced.

What Mr. Greenwood did testify to was that if you have a signature on a blank piece of paper, by using a computer and a scanner it would be a fairly easy task to add text to it. He also said the date on the Power of Attorney is misaligned with the rest of the text, and could possibly have been added years later. Mr. Greenwood further pointed out that the words "Power of Attorney" seems much higher than the date. (Trial Transcript, vol. 2, 246:8-12, 246:23-247:6, 247:13-18, 248:8-12; Trial Exhibits 81-3 and 81-4.) Defendant's argument does not indicate any "change" in Plaintiff's testimony.

(2) In its second "discredited claim," Defendant makes the brazen allegation: "At trial Plaintiff lied about the nature of his relationship with Mike Kim as being strictly 'professional and work related' stating that it was limited to occasional lunches and after work dinners." (Def. P&As, p. 12, lines 2-5.) This allegation is based solely on two pieces of evidence that Defendant's counsel obtained from the identity thief Mike Kim: a "shocking" color photograph of Plaintiff and his wife smiling, with patchy snow in the background; and a statement that Plaintiff would play tennis with Mike Kim and his buddies "from time to time on the weekend." According to Plaintiff's testimony, however, it was Mike Kim, as his clinic employer, who suggested a ski trip be taken together by the clinic employees. (Trial Transcript, vol. 2, 321:16-21; 317:7-12.) In short, the ski trip was at Mike Kim's origination and urging, and was not something Plaintiff requested.

As to the tennis issue, Mike Kim himself testified that there were two occasions he asked Plaintiff to join him and his buddies in September or October and once in November 2008. (Trial Transcript, vol. 3, 431:13-18.) Defendant's citation regarding the tennis issue is, again, inaccurate – "CRT Page No. 321, Lines 1-6, Vol.

II" is completely inapposite. That Plaintiff did not rebuff his then-boss's urgings to go on a company ski trip or a couple times to play tennis with his friends does not indicate that the relationship between Plaintiff and Mike Kim was one of best friends, as Defendant misleadingly attempts to suggest.

(3) In its third "discredited claim," Defendant alleges that Plaintiff misrepresented what Angela Jarosik told him regarding sending more documents to BMWF in support of his identity theft claim. Again, Defendant provides a completely inapposite citation. "CRT Page No. 321, Lines 1-6, Vol. II" is part of Ms. Caley's Recross-Examination of Mr. Tarter and has nothing to do with this issue. The best rebuttal to Defendant's argument that Angela Jarosik was supposedly waiting for Plaintiff to send additional documents that he never sent her is Jarosik's testimony itself:

Q. Um, is there anything that you felt you needed during your investigation that Mr. Seungtae Kim refused to provide you?

A. No.

Q. He gave you everything you asked for; isn't that right?

A. Correct.

Q. Did you get the impression that he wasn't cooperating during your investigation?

A. No.

Q. Did his story ever change that he was not involved in the purchase.

A. No.

(Trial Transcript, vol. 3, 508:3-15.) Further, there was no credible evidence that BMWF would have changed its position that the BMWF account was a "straw purchase," not an identity theft, even if Plaintiff had provided additional documentation.

(4) Defendant's "discredited claim" number 4 misstates Plaintiff's testimony and misstates the facts. Plaintiff did ***not*** claim to "immediately know the identity of his alleged identity thief, Mike Kim." As Plaintiff explained at length, he did not include the name of the suspect Mike Kim on the first police report because he did not know it at the time. He only learned of Mike Kim as the identity theft suspect ***after*** he filed his September 7, 2013 Police Report. Within one week after that filing the report, he received his statement from Kia Financial with Mike Kim's identity on it. That is why he was able to reference Mike Kim as the suspect on the BMW affidavit he signed and had notarized on September 18, 2013. Plaintiff further testified there was no place to mention Mike Kim's name in the follow-up Police Report, which only asked for his economic losses. (Trial Transcript, vol. 2, 330:18-335:23; Trial Exhibit 46.)

The fact that Plaintiff did not immediately know the identity of Mike Kim as the alleged identity thief is further supported by the fact that when Plaintiff first contacted BMWF on September 9, 2013, there is no reference to him mentioning Mike Kim in BMWF's Service Notes, but he did state that he was the victim of identity theft and was not present at the signing of the car purchase documents. (Trial Exhibit 108, p. 6, second entry.)

(5) Defendant's "discredited claim" number 5 misstates the testimony and the fact as to the date 2007. Defendant contends Plaintiff testified at trial that he was asked twice by Mike Kim if he could use his personal information to buy a car in 2007 and 2011, but in his deposition Plaintiff said Mike Kim never asked him to purchase an automobile.

First of all, Plaintiff did not even know Mike Kim in 2007. Plaintiff actually testified at trial that ***around June of 2009*** Mike Kim wanted to use Plaintiff's personal information to buy a car, but Plaintiff never gave him permission to do so. (Trial Transcript, vol.2, 268:6-18.) In 2011, the same scenario occurred again, with

Mike Kim asking Plaintiff to use his personal information and Plaintiff responding, no. (Trial Transcript, vol. 2, 269:21-271:1.) This is entirely believable since Mike Kim did the same thing to Dr. Seo, seven or eight times. (Trial Transcript, vol. 2, 370:25-371:11.)

Plaintiff patiently explained to Defendant's counsel in his trial testimony: "But during the deposition, what I understood the question to be was whether he [Mike Kim] directly asked me to help him buy the car, whether financially or directly, so that's why I said 'no' during the deposition. But today the question was whether he asked to use my personal information, so that's why I said 'yes.'" (Trial Transcript, vol. 2, 338:9-14.) In short, Defendant's counsel asked two different questions at the deposition and at the trial, and now insists that Plaintiff was lying because counsel did not get the same answer to two distinct questions.

(6) Defendant's "discredited claim" number 6 again misrepresents the trial testimony and is argumentative. Defendant makes several allegations of what Plaintiff stated in his trial testimony concerning the April 11, 2011 Experian credit reports (Trial Exhibits 153 and 154), more than implying that his statements must be lies. Taking the last allegation first, Defendant claims that Plaintiff never reviewed those credit reports. However, Plaintiff's testimony was that, as to Exhibit 154, he just roughly looked at it to see if there was anything negative on it. He did not review it in detail. (Trial Transcript, vol. 2, 350:17-18.) It is entirely credible that, since the BMWF tradeline was not reporting negatively on Plaintiff's credit at that time, that he would have seen it.

Defense called Ms. Marquez from Experian to cast doubt on Plaintiff's assertion that he received the credit reports in the mail unsolicited. However, Marquez could not even say for certain by looking at the credit reports if they were mailed or downloaded from the Internet. (Trial Transcript, vol. 3, 408:5-12.) She did, though, confirm that the BMWF tradeline was in a positive status at the time of this

report. (Trial Transcript, vol. 3, 408:22-409:4.) Again, if Plaintiff gave a rough look to see if there was anything negative on the report, there is a very good chance that he would not have seen the BMWF reporting.

Casting doubt on Marquez's testimony that Experian never makes mistakes when it comes to sending out unsolicited credit reports, the very fact that the same credit report was sent to Plaintiff twice indicates an administrative glitch at Experian regarding this report.

(7) Defendant's "discredited claim" number 7 regarding two words in his first name on Plaintiff's California Acupuncture License is irrelevant. Plaintiff did not create this document; it was prepared by the California State Acupuncture Board. As the Court pointed out, Defendant never established that Plaintiff asked that it be that way. (Trial Transcript, vol. 2, 384:6-14.) Plaintiff's tolerance of the license as it was in no way challenges his credibility.

(8) Defendant's "discredited claim" number 8 is a glaring example of fallacious reasoning. Defendant tries to suggest that Plaintiff was lying when he testified that he was denied credit three times in 2013 by Bank of America, Toyota and Audi because (a) he does not remember exactly when he applied for the credit; and, (b) he has no documents evidencing the denials. Not remembering exact dates of certain events does not make one a liar. Not having documents evidencing credit denials is a commonplace circumstance and certainly does not establish a person as untruthful. Plaintiff explained that he applied for these three credit items in person, not online, which explains why he did not receive credit denial documents.

It is apparent that Defendant is grasping at straws in its unfounded attempt to discredit Plaintiff's credibility.

///

///

///

### (c) **Plaintiff Presented Sufficient Evidence Supporting the Damages Award.**

Defendant argues that the damages award is inconsistent because Plaintiff received no noneconomic damages under the FCRA claim and $150,000 under the Identity Theft Law claim. Defendant's argument ignores Jury Instruction No. 33, which separates out non-economic damages, "2. …mental suffering or anguish, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation and emotional distress;" from, "3. Injury to reputation and creditworthiness." The two are distinctly different and BMWF did not object to this jury instruction when drafted and proposed by the court, thus waiving any objection. (Brennan Decl., Exhibit 5.)

Given the different scope of the two laws, the verdict was entirely consistent. Under the cause of action dealing specifically with *credit* reporting, the FCRA, the jury found damage to Plaintiff's reputation and *creditworthiness*. Under the cause of action dealing with identity theft, the jury found that plaintiff had suffered "mental suffering or anguish, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation and emotional distress" entirely separate from the damage to his *creditworthiness*. The jury's verdict is consistent.

Defendant relies upon two cases outside of the Ninth Circuit for its argument that the jury verdict that is "ineluctably inconsistent" or "irreconcilably inconsistent" may be grounds for a new trial: *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2nd Cir. N.Y. 2004), and *Johnson v. ABLT Trucking Co.*, 412 F.3d 1138 (10th Cir. Kan. 2005). In *Munafo*, the Second Circuit did not find the verdict ineluctably inconsistent, so the case is not instructive. Similarly, in *Johnson*, the Tenth Circuit did not find the jury verdict "irreconcilably inconsistent" simply because the jury did not award future pain and suffering, and allowed only for a substantial award for future economic damages.

///

///

### (d) **Plaintiff Presented Sufficient Evidence to Support the Civil Penalty Under the Identity Theft Law.**

Defendant also argues that the civil penalty was improper because the jury's finding that Defendant had reasonable procedures in place is irreconcilable with an award that Defendant failed to diligently investigate. To the contrary, while Defendant may have had procedures in place, *it failed to follow them*. The same portions of the record discussed above supporting the damages award also support the award of a civil penalty.

The California Identity Theft Law provides for a civil penalty if the identity theft victim established by clear and convincing evidence all of the following:

> (A) That at least 30 days prior to filing an action or within the cross-complaint pursuant to this section, he or she provided written notice to the claimant at the address designated by the claimant for complaints related to credit reporting issues that a situation of identity theft might exist and explaining the basis for that belief.
>
> (B) That the claimant failed to diligently investigate the victim's notification of a possible identity theft.
>
> (C) That the claimant continued to pursue its claim against the victim after the claimant was presented with facts that were later held to entitle the victim to a judgment pursuant to this section.

*Civil Code* § 1798.93(c)(6)(A)-(C).

Plaintiff's evidence establishing these three conditions was clear and convincing. The trial testimony of Ms. Jarosic and Ms. Parillo revealed a slipshod investigation with no trained personnel to compare signatures, contact Mike Kim, contact any law enforcement agency to check if other identity thefts could have the characteristics of this one, etc. This was a very superficial investigation, designed only to look for evidence to support a preliminary conclusion of "straw purchase" when substantial evidence supported the opposite conclusion of "identity theft." Mr. Tarter testified that the so-called investigation in this case was wholly unreasonable

under the circumstances. (Trial Transcript, vol. 1, Thomas Tarter testimony, 169:14-177:10; testimony of Angela Jarosic (cross-examination), vol. 3, 499:2-514:16).

## D. THE COURT DID NOT ERR IN GIVING OR REFUSING TO GIVE ANY JURY INSTRUCTIONS.

### 1. The Jury Did Not Have to be Given an Instruction that Plaintiff Could Not Recover Damage Under the FCRA for a Dispute Made Directly with Defendant.

Defendant does not dispute that Plaintiff complied with FCRA requirement for filing the dispute through a credit reporting agency (CRA). The notice of dispute filed through the CRA does not "cabin the scope of the investigation once undertaken." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157, fn. 11 (9th Cir. Cal. 2009). The instruction suggested by Defendant, that a consumer cannot bring a lawsuit when the consumer disputes the information directly with the furnisher, is argumentative and would have been confusing to the jury because Plaintiff in fact disputed the credit reporting through the CRA. The instruction would have been an improper attempt by Defendant to mislead the jury into disregarding evidence that Defendant could not otherwise keep out of evidence on legitimate grounds.

### 2. The Jury Did Not Have to be Given an Instruction on How a Determination of a "Reasonable Investigation" is Made Under the FCRA.

Defendant relies upon *Gorman v. Wolpoff & Abramson, supra*, in arguing that the jury should have been given an instruction that the term "reasonable investigation" under the Fair Credit Reporting Act (1) depends "most importantly" on the CRA's description of the dispute in its notice, and (2) that an investigation is not necessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate. The first part of the instruction is false. The Court in Gorman stated: "In deciding that the notice

determines the nature of the dispute to be investigated, we do not suggest that it also cabins the scope of the investigation once undertaken." *Id.* at 1157, fn. 11.

Defendant attempts to shore up its argument, citing *Gustafson v. Experian Info. Solutions, Inc.*, 2015 U.S. Dist. LEXIS 71280, *13 (C.D. Cal. June 2, 2015). (Def. P&As, p. 19, lines 20 – 23.) A closer examination of *Gustafson* reveals that the Court was not making a blanket statement that the furnisher need not do more in an investigation, even if additional information falls into its hands. The furnisher in that case had no basis for investigating beyond what was in the notice of dispute. The jury instruction proposed by BMWF would have been misleading.

As for the second part of the instruction, it is dicta in *Gorman* because the resolution of the case on summary judgment did not turn on the furnisher's conclusion having been proven inaccurate. *Gorman, supra*. The instruction applies more to the furnisher's procedures. If the furnisher's procedures are reasonable *and followed*, the furnisher should not be held liable. There was no indication in *Gorman* that its procedures were not followed. It would have been confusing to give the jury the suggested instruction that, in effect, a furnisher need not follow its procedures.

## IV. CONCLUSION

For the above-stated reasons, Defendant's motion for a new trial should be denied.

Respectfully submitted,

Dated: Oct. 14, 2015 **LAW OFFICES OF ROBERT F. BRENNAN, A P.C.**

By: */s/ Robert F. Brennan*

Robert F. Brennan
Attorney for Plaintiff
SEUNGTAE KIM